M2S1ANIS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4            v.                            21 Cr. 88 (JSR)

5    LORD ANING,

6                Defendant.               Sentencing
     ------------------------------x
7
                                          New York, N.Y.
8                                         February 28, 2022
                                          4:35 p.m.
9

10   Before:

11                   HON. JED S. RAKOFF,

12                                        District Judge

13
                          APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  SAGAR K. RAVI, ESQ.
          Assistant United States Attorney
17
     KLINGEMAN CERIMELE, ATTORNEYS
18        Attorneys for Defendant
     BY:  ERNESTO CERIMELE, ESQ.
19

20

21

22

23

24

25

M2S1ANIS

1          (Case called)

2          THE DEPUTY CLERK:  Will the parties please identify

3    themselves for the record.

4          MR. RAVI:  Good afternoon, your Honor.  Sagar Ravi for

5    the United States.

6          THE COURT:  Good afternoon.

7          MR. CERIMELE:  Good afternoon, your Honor.  Ernesto

8    Cerimele, attorney for defendant Lord Aning, standing to my

9    left.

10          THE COURT:  Good afternoon.  Please be seated.

11          All right.  We're here for sentencing.  And the first

12    order of business is to calculate the guideline level, even

13    though, as all counsel are doubtless aware, I give the

14    guidelines very little weight.  I should say I give the

15    guidelines the weight that they deserve, which is modest.

16          Anyway, the presentence report calculates the total

17    offense level as 24, the criminal history category as I, and

18    the guideline range as therefore 51 to 63 months.  Any

19    disagreement with that from the government?

20          MR. RAVI:  No, your Honor.

21          THE COURT:  From the defense.

22          MR. CERIMELE:  No, your Honor.

23          THE COURT:  The Court also agrees and will adopt that

24    guideline range and also adopt the presentence report.

25          So now we turn to what is of great interest to the

M2S1ANIS

1    Court, which is what sentence to impose under Section 3553(a),

2    and we'll hear from counsel and then from the defendant if he

3    wishes to be heard.

4          Counsel should go to the rostrum, and you can take off

5    your mask, which makes it much easier for the court reporter to

6    pick up the nuances of your remarks.  So we'll hear first from

7    defense counsel.

8          MR. CERIMELE:  Thank you, your Honor.  We filed a

9    sentencing submission dated February 21, 2022, and I will

10   incorporate that by reference.  I intend to be brief.

11         I did want to highlight the following:  Number one,

12   both the government and the defendant are seeking a variance

13   here.

14         THE COURT:  Yes.  It's interesting.  The probation

15   officer did ask for a guideline sentence, albeit at the low end

16   of the guideline range; the defense asks for a noncustodial

17   sentence; and the government, very much to its credit, I think,

18   recognized that the guidelines were too high in this particular

19   case and asked for, if I recall correctly, a 39-month sentence.

20   But there's still a long way between 0 and 39.  So let's hear

21   from defense counsel.

22         MR. CERIMELE:  No question, Judge.  The reality is the

23   defendant is ultimately going to be removed from this country

24   and his family, and we believe that that is significant and

25   that warrants a significant variance.

M2S1ANIS

1    Number two, this is the defendant's first criminal

2    conviction.  He has had no other run-ins with law enforcement

3    in his life.

4    Number three, this is a non-violent offense, and

5    Mr. Aning has never been a violent person.

6    Number four, Mr. Aning was an easily replaceable

7    member of the conspiracy.  He was fungible.

8    THE COURT:  Well, I'm not sure I understand.  All your

9    other arguments I certainly understood.  So in many

10   conspiracies there are lots of people who could do the evil

11   work, but only those who actually do it, or agree to do it,

12   commit a crime.  So the fact that he could have been replaced

13   by someone else, what does that matter?  He did what he did.

14   MR. CERIMELE:  You're right, your Honor.  And I equate

15   this to a drug conspiracy, right?  When you have a totem pole,

16   those on top are giving the directions and those on the bottom

17   are the street-level dealers, right?  And those are the people

18   who, if one person declined, easily replaceable; they can fill

19   that role with someone else.  The point is that that is what

20   Mr. Aning was to this conspiracy.  He was present in the United

21   States, which was significant, okay?  Because he was present in

22   the United States, he became an easy target for his

23   co-conspirators, who were abroad.  He was approached by his

24   co-conspirators abroad because he was in the United States and

25   he had the ability to get bank accounts.  And ultimately he

| 1 | agreed.  If he didn't agree, someone else would have filled |
| 2 | that role, but he was by no means a decision-maker, he by no |
| 3 | means gave directions; he accepted the directions and he |
| 4 | implemented them.  And I'll get into this in a second, your |
| 5 | Honor.  His role was instrumental, no doubt.  If he wasn't part |
| 6 | of this conspiracy, the conspiracy didn't work.  But if he |
| 7 | wasn't part of the conspiracy, someone else would have been. |
| 8 | Finally, Judge, point number five is that Mr. Aning |
| 9 | deeply regrets his decision to participate in this offense.  It |
| 10 | was wrong.  He accepted responsibility.  And that is the single |
| 11 | most important thing that I will say this afternoon.  He |
| 12 | admitted his wrongdoing, sooner than any other defendant, and |
| 13 | he fully disclosed his involvement to the government in June of |
| 14 | 2021. |
| 15 | For nearly 30 years, Mr. Aning was a model member of |
| 16 | society.  He's kind, he is generous, he is selfless, and that |
| 17 | is a theme that resonates through the letters that were |
| 18 | addressed to your Honor.  I won't go through them.  I know that |
| 19 | your Honor is in possession of them.  But certainly, in every |
| 20 | letter written to your Honor, they describe Mr. Aning as |
| 21 | selfless.  He worked tremendously hard, before he entered the |
| 22 | United States, to put himself in a position where he could |
| 23 | eventually come to the United States and be with his mother and |
| 24 | his sister.  And then once he got to the United States, |
| 25 | legally, he worked tremendously hard to be an upstanding member |

M2S1ANIS

1  of society.  He went to school; he worked; he supported his

2  family.  And then ultimately, a few years ago, he made an

3  egregious mistake.

4          THE COURT:  Well, how do you square that with the fact

5  that he then voluntarily chose to involve himself in a fairly

6  sophisticated scheme where he opened numerous bank accounts and

7  took other measures that certainly suggested that he was

8  perfectly happy to make use of the fact that he was in the

9  United States to carry out the scheme?

10          MR. CERIMELE:  You can't square it, your Honor.  He

11  made a mistake.  And it was an egregious mistake.  Again, he

12  was approached by others from abroad to use bank accounts.

13  They needed the bank accounts to make the conspiracy work, and

14  he agreed.  Initially he was ignorant to the fact that what he

15  was doing was criminal.  He didn't know the details of the

16  conspiracy.  He assumed he was doing something wrong, but he

17  couldn't tell you where the money was necessarily coming from

18  or what the money was going into the accounts for.  Initially.

19  He later learned, and he continued to engage in that conduct.

20  For that he is regretful.  And in a lot of ways, your Honor, a

21  significant sentence has already been imposed.  He deals with

22  the consequences of his actions on a daily basis.  He is

23  humiliated, he is embarrassed.  His reputation has been

24  tarnished.  He finds himself isolated.  And early on, he also

25  spent quite some time in custody before he was afforded

M2S1ANIS

1    release.

2          Now as the Court is aware, Mr. Aning was also charged

3    with multiple co-conspirators.  He did not know those

4    co-conspirators.  But it is important for your Honor to assess

5    Mr. Aning's role related to the co-conspirators' roles, the

6    co-defendants' roles.  As your Honor is aware, a couple of

7    weeks ago, Fred Asante pled guilty before your Honor.  Asante

8    controlled over a dozen business bank accounts with deposits

9    totaling over 35 million, he profited close to $650,000, and

10   the government seized about $323,000 in his account upon his

11   arrest.  He was also in possession of an expensive 2021

12   Mercedes-Benz at the time of his arrest.  His co-defendants

13   were also in possession of a 2020 Bentley Continental and two

14   2019 Rolls Royces.  Each of those last three had values in

15   excess of hundreds of thousands of dollars.

16          On the other hand, at the time of the offense, at the

17   time of his arrest, Mr. Aning was not in possession of luxury

18   cars or expensive jewelry or sacks of cash.  He had a bank

19   account, a personal bank account that had about a thousand

20   dollars in it.  And he had $15,000 in debt.  He received a

21   financial benefit for his conduct, right?  He was motivated to

22   participate in the conduct for the money.  For a young man, who

23   is living in north New Jersey, who was trying to go to school,

24   who was trying to pay for books, who was trying to support his

25   family, the money helped.  He made $170,000, not all at once.

M2S1ANIS

1    That's a substantial amount of money, no doubt, but it is a

2    pittance compared to his co-conspirators abroad and his

3    co-defendants in this case.  That $170,000 was, again, not made

4    at once, it was made over the course of several years, so he

5    made about 30 or $40,000 a year.  And he was wrong for doing

6    that, and shame on him.  But he has accepted responsibility for

7    his conduct, your Honor.  He accepted it quickly.  He has

8    suffered immensely, and he will continue to suffer.

9           As I stated early on -- and I'll leave with this --

10   Mr. Aning is going to be removed from the United States after

11   his sentence.  He will be permanently separated from his mother

12   and his sister.  He has made selfish decisions that do not

13   represent who he is, and don't represent the person that he was

14   brought up to be, and he regrets that.  But that is an

15   extraordinary penalty, it is a significant penalty, and that is

16   why we are asking for a significant variance.

17          With that, your Honor, I know that Mr. Aning would

18   like to address the Court.

19          THE COURT:  Well, I'll hear first from the government.

20   So thank you very much.  Let me hear from the government.

21          MR. CERIMELE:  Thank you.

22          MR. RAVI:  As the Court is aware, the government --

23          THE COURT:  You can take off your mask.

24          MR. RAVI:  Thank you.  It feels like normal.  All

25   right.

M2S1ANIS

1          As the Court is aware, the government is asking for a

2     sentence of no less than 39 months for the reasons we set forth

3     in our sentencing submission.

4          THE COURT:  Let me ask you this.  First, where do you

5     place this defendant in the hierarchy of the various people

6     you've indicted in this case?

7          MR. RAVI:  Sure.  So your Honor, there are

8     defendants -- and the government referenced another case that

9     was charged in front of Judge Cote with some other defendants

10     that were charged as part of the broader enterprise, but there

11     are essentially a few tiers of defendants, types of defendants

12     in this case.  The first are what we'd call kind of money

13     mules, who largely were there to transport money and cash from

14     other folks who had bank accounts that received funds and that

15     were then kind of carrying this money abroad.

16          Then there's a kind of a second tier that had bank

17     accounts and that were involved in minimal amount of

18     transactions, largely in their own personal accounts, and that

19     they were then laundering that money abroad.

20          The third tier is the more sophisticated money

21     launderers, and I believe Mr. Aning falls within that tier.

22     These are defendants who opened companies for the purposes of

23     laundering money, so that they could launder money through

24     banks and business bank accounts as a personal bank account

25     because banks provide -- there's less scrutiny when it comes

M2S1ANIS

1   from business bank accounts because they'd be receiving

2   transactions in large amounts of money from various sources so

3   therefore there's less scrutiny.  Mr. Aning falls within that

4   category.

5           Now I think as defense counsel alluded to, in just the

6   four defendants before your Honor, Mr. Aning is the least

7   culpable of those four defendants in that the amount of money

8   that he transported through his accounts was the least of the

9   four defendants before your Honor.  There are other defendants

10  that were charged -- and the government mentioned some of them

11  in one of the footnotes in our submission -- that were similar

12  to Mr. Aning in that they also transported amounts of money

13  through business bank accounts.  The amounts that those

14  defendants, however, were involved in were less than Mr. Aning.

15  Mr. Aning here has, you know, over the course of three years,

16  received at least $1.7 million in fraud proceeds that involved

17  nine bank accounts that he had opened and involved eight

18  different banks.  So his conduct was extensive.  This is not a

19  one- or two-transaction person who made a mistake and then

20  regretted it.  This is someone who chose, over three years, to

21  engage in this conduct.  And he received victim money from 62

22  different victims, at a minimum, that the government has

23  identified.  And he made $170,000 in profits.  This is

24  significant conduct, and, you know, the overarching purpose of

25  sentencing that would be served here would be to reflect the

M2S1ANIS

1     seriousness of this offense, to promote respect for the law,

2     and to provide for just punishment.

3           The second kind of big sentencing factor here that's

4     relevant is general deterrence.  I think, you know, defense

5     counsel made the point that, well, Mr. Aning got caught and

6     he's going to get sentenced but there's anyone who can do this

7     work.  I don't disagree with that statement, your Honor, but

8     it's important that there be a significant sentence given here

9     to discourage others and to send a message that, you know, if

10    you choose to engage in this conduct and you choose to engage

11    in extensive conduct like this over multiple years, involving

12    dozens of victims and millions of dollars, you will get a

13    substantial sentence.

14          THE COURT:  Well, that, of course, is true as a

15    general proposition, but the studies that have been conducted

16    to try to ascertain the effect of general deterrence in

17    white-collar crimes have not been able to show that, for

18    example, a three-year sentence has a significantly more

19    deterrent effect than a one-year sentence.  So what you say is

20    true as far as it goes, but it's I think of limited value in

21    determining a specific sentence.  It is unquestionably true

22    there are a lot of studies that show that would-be white-collar

23    miscreants are deterred if they know there is a likelihood of

24    prison that follows.  So the argument against time served would

25    be applicable there.  But there is no study that I'm aware of,

M2S1ANIS

1   unless you are, that that general deterrence effect in a

2   white-collar case is not served by a one-year sentence or a

3   two-year sentence, it can only be served by a three-year

4   sentence or whatever.

5          MR. RAVI:  I hear you, your Honor, on that, and I'm

6   not aware of another study either, and I think it's very hard

7   to measure the effect of these sentences.

8          THE COURT:  That's correct.  It's very hard to

9   measure.  You got it.

10         MR. RAVI:  So I hear your Honor on that.  I think what

11  we have here are, you know, the data points regarding other

12  defendants who have been sentenced to significant jail time for

13  less amounts of money, at least in a companion case.

14         THE COURT:  Let me ask you one other question.  He

15  proffered cooperation.  Ultimately, as I understand, it wasn't

16  something the government needed.  Was his proffer, in your

17  view, truthful?

18         MR. RAVI:  It was truthful, your Honor.  I think the

19  other kind of big reason the government didn't continue with

20  cooperation was, the defendant simply wasn't able to provide

21  much information about the people he was laundering the money

22  for.

23         There's just one other point I want to make, just

24  about the purpose of addressing unwarranted sentencing

25  disparities.  Defense counsel mentions in their letter, they

M2S1ANIS

1    provide some statistics to the Court that for offenders in a

2    criminal history category of I, the mean sentence was 16 months

3    and the median was six months.  You know, I think the Court

4    probably is aware that, you know, that does not at all reflect

5    in any way their offense level.  This is all defendants in 2020

6    who were sentenced with a criminal history category of I.

7               THE COURT:  Yes.  One of the reasons that I don't much

8    care for the guidelines—although there are many, many

9    reasons—is that it's all sort of numbers playing, and I think

10   that's true, perhaps to a lesser extent, about the point you're

11   just referring to in defense counsel's papers.  What's critical

12   I think for any judge is to look at the facts of the case

13   before him, the facts of the person, the human being before

14   him, and not to get caught up with more than a modest reliance

15   on comparisons with other cases, which the judge often knows

16   nothing about.  The guidelines, in their wisdom or lack

17   thereof, attempted to do away with disparities.  That's a total

18   myth.  They've created far greater mischief than any cure that

19   they've had on disparities.  Most disparities are achieved

20   these days through plea bargaining, where the courts have no

21   say and the guidelines have no say, other than, as part of the

22   negotiation, a guideline range is determined.  So we have the

23   irony that it is the parties and mostly the government that is

24   determining guidelines sentences, and they're all over the lot,

25   depending on the prosecutor, depending on the case, whatever,

M2S1ANIS

1   and yet the myth is, oh, the guidelines will therefore do away

2   with disparities.  Well, no, it's just forced the disparities

3   back to a secret negotiation that can never be measured by the

4   Court.  So the same is true I think in furtherance of what

5   you're saying with respect to here's what a mass of people get

6   in category I or whatever.  To me it's not irrelevant, but it's

7   not highly relevant.

8           MR. RAVI:  Your Honor, and just to respond to some of

9   the statistics that defense counsel gave, I looked at the --

10  there's something called the Judiciary Sentencing Information

11  Tool, which the Court might be aware of, and, you know, for the

12  past five years, from 2016 to 2020, for all defendants like

13  Mr. Aning who had guidelines under 2B1.1, with a category I and

14  an offense level of 24, which he has, there were 442 offenders

15  in that category for those five years, and 97 percent of them

16  received a sentence of imprisonment, and of those 97 percent,

17  the average length of imprisonment was 40 months and the median

18  was 42 months.

19          THE COURT:  Right.  And that's, in my mind, just as

20  irrelevant as the statistics that your adversary gave.  But

21  thank you anyway.

22          MR. RAVI:  Thought you should hear from both sides at

23  least, your Honor.

24          THE COURT:  You know, I can't wait till law schools,

25  instead of offering a course in criminal law, offer a course in

M2S1ANIS

advanced arithmetic.  But in any event, I hear what you're

saying.

              MR. RAVI:  So to that end, your Honor, we have this

defendant before us.  I think the Court is aware of the

defendant's criminal conduct here, weighed against some of the

good factors here, which is the defendant's acceptance of early

responsibility, his coming in and his truthfulness during the

proffer, which drives the government's below-guidelines

recommendation.

              THE COURT:  Thank you very much.

              Let me hear from the defendant, if he wishes to be

heard.

              THE DEFENDANT:  Good afternoon, your Honor.  My name

is Lord Aning.

              I just want to say I'm like deeply sorry for my

actions.  And I'm really very aware of the consequences now.  I

just wish I knew better, and made better choices, and I wished

I had listened to my family earlier on, because if I did, I

wouldn't be here right now, due to the fact that this isn't the

way they raised me, and I just want to say I'm sorry for

letting them down.  And to all the victims involved.  To some

extent I didn't know how everything was moving around.  I later

got to know, but -- so I didn't really know everything like

hundred percent, but still, I'm sorry for my actions.  And

standing here, I already feel ashamed, looking back home to my

M2S1ANIS

1    friends, to my family.  I really recall when I was released

2    from jail, a few friends came over, and one thing they actually

3    say that kept ringing in my mind was, they looked on me very

4    disappointed, and majority of them were surprised to see me

5    doing something like that because they actually all looked up

6    to me, expected better things from me, because I was always

7    there for them, motivating them, trying to keep smiles on their

8    faces, and I really let everybody down.  I wish I knew every

9    victim's house or probably where they lived so I could just go

10   and say sorry to them.  That's how I really feel.

11          And to my family and my close friends and loved

12   ones -- I wish a lot of them were here -- I just want to say

13   I'm sorry, for letting them down and not being able to live up

14   to the person they wanted to see me be.

15          Thank you.

16          THE COURT:  Thank you very much.

17          Well, on the one hand, the Court is not convinced that

18   a substantial period of incarceration such as suggested by the

19   government is necessary to serve the general deterrence

20   function of Section 3553, though conversely, the Court is of

21   the view that some prison time is always required to serve a

22   meaningful general deterrence in all but the most exceptional

23   white-collar cases.  White-collar cases are committed, as this

24   one was, for the money, and therefore no amount of monetary

25   fine or restitution or whatever is going to be a meaningful

M2S1ANIS

1    deterrent; only prison time is a deterrent.  I'm talking about

2    general deterrence now.

3          So the hard question is:  How much prison time?  So

4    the defendant has many positive things in his character, and I

5    think that was illustrated by the fact that upon his arrest, he

6    immediately sought to cooperate and tell the facts.  Now it

7    turned out he wasn't someone the government needed, and the

8    government rightly doesn't just willy nilly cut cooperation

9    agreements with everyone who fesses up.  But nevertheless, it

10   speaks to the defendant's ultimate ambivalence about his

11   misconduct that, once caught, he fessed up and was willing to

12   cooperate against others if the government had chosen to use

13   him for that purpose.  And those who do cooperate with the

14   government often get very substantial reductions in sentence,

15   and so even those who don't get that same benefit, because

16   their cooperation is not used, do fulfill some of the same

17   functions that cooperators do, or at least it evidences a more

18   positive side of their character.

19         But on the other hand, what really stands out about

20   this case is the amount of time the defendant spent helping to

21   steal money from innumerable human beings.  The restitution

22   order that was presented to me, and which I have just signed

23   and will give to my courtroom deputy to docket, lists just

24   large, large number of victims, who range all the way from

25   people who lost a thousand dollars to a person who lost

M2S1ANIS

1    $150,000.  And by the way, the chance that these folks will get

2    their money back is extremely low.  The restitution provisions

3    of federal law are, unfortunately, more a matter of paper than

4    a matter of reality.  I will throw in one statistic of my own,

5    which is that overall, less than 10 percent of all restitution

6    that's imposed by the courts is actually paid.  And that's

7    understandable, because when the folks get caught who committed

8    the crimes, they're usually either out of money or soon will

9    be.  But these are real victims—not one, not two, but dozens of

10   real victims—and they cannot be forgotten when a court imposes

11   sentence.

12           So the sentence of the Court is that the defendant is

13   sentenced to 24 months in prison, to be followed by three years

14   of supervised release, although that may turn out to be moot

15   given the immigration issues.  But the terms of supervised

16   release I'll get to in a moment.

17           No fine will be imposed because there is this

18   restitution order, which I will now hand to my courtroom deputy

19   to file, which is in the total sum of $1,704,408.52, and that,

20   needless to say, will exhaust, or more than exhaust any funds

21   that this defendant has available.

22           There is, however, a $100 mandatory special assessment

23   that must be paid.

24           The terms of supervised release are:

25           First, the mandatory conditions that the defendant not

M2S1ANIS

1    commit any other federal, state, or local crime;

2              That he not unlawfully possess a controlled substance;

3              That he make restitution in accordance with the

4    schedule that I'll set in a moment; and

5              That he cooperate in the collection of DNA.

6              The other mandatory condition, the drug testing

7    condition, is suspended, based on the Court's determination

8    that the defendant poses a low risk of future substance abuse.

9              There will also be imposed the standard conditions 1

10   through 12.  They appear on the face of the judgment, but will

11   also be gone over with the defendant when he reports to the

12   probation office, which he must do within 72 hours of his

13   release from prison.

14             And there are the special conditions:

15             First, that he provide the probation office with

16   access to any requested financial information.

17             Second, that he not incur new credit charges or open

18   additional lines of credit without the approval of the

19   probation officer unless he is in compliance with the

20   installment payment schedule.  The installment payment schedule

21   is that payment must be made beginning the second month of

22   supervised release at the rate of 15 percent of his gross

23   monthly income.

24             Third, that he must obey the immigration laws and

25   comply with the directives of the immigration authorities.

M2S1ANIS

```
1          And fourth, that he be supervised by the district of

2     his residence.  Although, again, this may be superseded in

3     effect by deportation.

4          Before I advise the defendant of his right of appeal,

5     is there anything else that either counsel wishes to take up

6     with the Court?  Anything from the government?

7          MR. RAVI:  The government would move to dismiss all

8     open counts against the defendant.

9          THE COURT:  That motion is granted.

10         MR. CERIMELE:  Your Honor, at the end of our

11    sentencing submission, we requested that the defendant be --

12         THE COURT:  I'm sorry?

13         MR. CERIMELE:  Sorry.  At the end of our sentencing

14    submission, we made a request that the defendant be able to

15    self-surrender.

16         THE COURT:  Yes.  So let's set the surrender date.

17         THE DEPUTY CLERK:  April 12th before 2:00.  That's a

18    Tuesday.

19         THE COURT:  April 12th by 2 p.m.

20         Now I can't order where he will be detained but I can

21    recommend.  Do you have a recommendation?

22         (Mr. Cerimele confering with the defendant)

23         MR. CERIMELE:  Your Honor, somewhere nearest where he

24    currently resides in Virginia.

25         THE COURT:  Okay.  I will so recommend.
```

M2S1ANIS

1          MR. CERIMELE:  Thank you, your Honor.

2          THE COURT:  So Mr. Aning, you have a right to appeal

3    this sentence.  Do you understand that?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  And if you can't afford counsel for the

6    appeal, the court will appoint one for you free of charge.  Do

7    you understand that?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Very good.  Thanks a lot.

10                              o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25